*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* CASTO, Minors.

FOR PUBLICATION
December 8, 2022
9:05 a.m.

No. 357656
Ottawa Circuit Court
Family Division
LC No. 20-093901-NA

Before: SWARTZLE, P.J., and RONAYNE KRAUSE and GARRETT, JJ.

SWARTZLE, P.J.

A young child discloses sexual abuse by a parent. The child is interviewed several times, and the statements are admitted as substantive evidence during child-protective proceedings. Several experts testify on behalf of the government with respect to coaching and other reliability-related matters, but the parent's counsel does not offer, or even investigate, an expert to test the government's case. Moreover, one of the government's experts vouches for the credibility of the child, without objection. Under these circumstances, the parent's counsel does not provide effective assistance, in violation of both our state and federal Constitutions. Accordingly, we must vacate the termination of parental rights and remand for new proceedings.

## I. BACKGROUND

Respondent-father appeals as of right the order terminating his parental rights to his children, BC and AC, under MCL 712A.19b(3)(b)(*i*), (g), (j), (k)(*ii*), and k(*ix*). Respondent and mother were married in 2013, but separated in 2018 and finalized their divorce in 2019. BC was born in 2014 and AC was born in 2018. Respondent is an independent sales representative in the manufacturing industry, and his territory covers Indiana, Ohio, and Michigan. During the marriage, mother was a hair stylist, but after the separation and divorce, mother became an unlicensed life coach and sales associate. With respect to her life-coach work, mother explained that she helps women process "similar things that [she has] gone through," including with "their sexuality and their self-esteem." Her work involves producing social-media content.

In September 2020, the Department of Health and Human Services (the "Department") filed a petition seeking termination of respondent's parental rights at the initial dispositional hearing. The Department alleged that respondent sexually abused BC and AC, including acts of

anal penetration, sexual touching, and taking video and photos of the abuse. The allegations arose from out-of-court statements made by BC about acts of sexual abuse experienced by BC and AC, from when BC was three to five years old and AC was less than two years old. Respondent's basic defense was that BC's mother, respondent's ex-wife, influenced BC to make these allegations out of anger toward respondent following their divorce and out of a desire not to share custody.

The Department filed a notice of intent to admit BC's statements under MCR 3.972(C)(2). The Department sought to introduce statements made by BC to (1) his mother; (2) BC's therapist, Renee Orr; and (3) Olga Mathis and Emily Friberg, forensic interviewers with the Child Advocacy Center in Ottawa County. The Department also sought to introduce statements made to mother's boyfriend, but the Department later withdrew that request, acknowledging that the statements did not meet the criteria in MCR 3.972(C)(2).

*Tender-Years Evidentiary Hearing*. At a tender-years evidentiary hearing before trial, mother, Orr, Friberg, and Mathis testified about BC's disclosures. According to mother, prior to the couple's separation, she never suspected that respondent was sexually abusing either child. After the separation, BC began to disclose abuse, beginning in October 2019 when he was four years old. Thereafter, BC and mother had several more conversations about the abuse, and BC made additional disclosures to mother.

Not long after making disclosures to mother, BC began discussing abuse with his therapist, Orr. She explained that when she first started to see BC in the fall of 2019 for problems involving the couple's separation, he was "practically non-verbal" and was having social difficulties at school; Orr suspected that BC might be autistic. Orr testified that BC disclosed that respondent sexually abused him. He never mentioned anything that would provide an alternative explanation for his knowledge about mature topics. Orr testified that there has "never been any . . . kind of reason to doubt that he's -- what he's saying is -- is his truth." When BC made a disclosure, Orr would tell him how "proud" she was and how "brave" he was for telling her.

As a mandatory reporter, Orr reported the disclosures to Children's Protective Services ("CPS"), and BC was forensically interviewed three times. Each interview was recorded and entered in evidence. In the first interview with Mathis in October 2019, BC made no disclosures of abuse by respondent. During an interview with Friberg in March 2020, and an additional interview with Mathis in June 2020, BC made disclosures of sexual abuse, naming respondent as the perpetrator. Mathis testified that, in her experience, it was not uncommon for a child to need more than one forensic interview before the child feels ready to make a disclosure about abuse. During the third interview, BC claimed that respondent abused him "[l]ike 60 times," including at the marital home in Jackson and on a family vacation to Disney World in Florida before the separation. Neither of the forensic interviewers observed any indication of coaching.

As for AC, BC first alleged in April 2020 that respondent also sexually abused his younger brother. AC—who was less than two years old when BC began making disclosures—has never made any disclosures of abuse, and because of his age, he was not forensically interviewed.

The trial court viewed the videos of BC's forensic interviews, and the parties stipulated to the admission of a trauma-assessment report by Dr. James Henry, director of the Western Michigan University Children's Trauma Assessment Center ("CTAC"). The trial court also heard testimony

from Trooper Maxwell Roy Nichols, who testified that a forensic analysis of five of respondent's electronic devices uncovered no evidence to support BC's reports. The trooper explained that he attended the latter two of BC's forensic interviews and included a summary of BC's statements to the local prosecutor. The local prosecutor declined to pursue criminal charges against respondent.

Respondent also testified, denying the allegations of abuse, maintaining that mother harbored considerable anger toward respondent because of an affair that ended their marriage. (He subsequently testified during the dispositional hearing that there were actually two affairs, and mother learned about the affairs after she tested positive for a sexually transmitted disease.) Respondent explained that mother had previously taken actions to frustrate respondent's access to the children by, for example, moving from Jackson to Jenison without informing respondent.

Following the hearing, the trial court admitted BC's statements to Orr, Mathis, and Friberg. With regard to mother, the trial court admitted BC's initial disclosure to mother. The trial court excluded the remainder of BC's statements to mother, concluding that they lacked sufficient indicia of trustworthiness because the statements were "made in the context of a contested custody and parenting time post-divorce relationship, along with the prior knowledge mother has gained from" BC.

*Adjudication Trial*. The matter then proceeded to the adjudication stage with a bench trial, consisting of testimony from mother, Orr, Mathis, and Friberg about BC's disclosures. The Department also presented testimony from Dr. Henry and a CPS investigator, Allison Wrobel.

With respect to her life-coaching work, mother testified that she does "a lot of [her] work when [her sons are] not in the home." She admitted, however, that they were present for "a handful maybe" of the "sexualized podcasts." Mother elaborated, "And yeah, I'm pretty free about what I talk around them. I don't try to hide it." She clarified, though, that she does not talk about "specific sexual content" around them.

Mother further testified that in 2019, while still living in Jackson, she took BC to an emergency room because of a swollen anus. He was examined by the hospital's children's protective team, but they found no conclusive evidence of sexual abuse; rather, they diagnosed the problem as stemming from poor hygiene. On another occasion in 2019, BC was diagnosed with a rash called molluscum.

Dr. Henry testified as an expert in trauma, trauma assessment, child maltreatment, and child development and sexual abuse. He described BC's IQ and language skills to be within the average range, and BC's physical examination showed no abnormalities. BC's communication skills and behaviors "were consistent with potential autism, high order autism," but Dr. Henry did not believe that this would prohibit BC from communicating effectively about past trauma.

With regard to the CTAC report that had previously been stipulated to by the parties, Dr. Henry described his understanding of the purpose of the evaluation of BC as follows: "The family court judge on the case ordered a CTAC assessment and is hoping to have another source to verify that [BC's] disclosures are credible regarding the sexual abuse of his father." Dr. Henry concluded in his report that the history of BC's disclosures and other circumstances "all support the veracity of [BC's] statements." During his testimony, Dr. Henry further explained that he tests to see if a

child is displaying signs of coaching and that, in this case, "there was no evidence of scripting at all." On the basis of an interview with BC and questionnaires completed by mother, Dr. Henry concluded that BC exhibited signs of trauma, including dysregulation and emotional responses when discussing the abuse, sexualized behavior, and guilt and shame. He opined that BC's sexual knowledge and behavior were consistent with sexual abuse as opposed merely to being exposed to sexual information. Orr likewise testified as an expert and concluded that she did not see any signs of coaching.

Respondent did not have an opportunity to provide any input before Dr. Henry prepared the CTAC report. Through no fault of respondent's, incorrect contact information was given to CTAC. After the CTAC report had already been completed, respondent was given an opportunity to speak with Dr. Henry. This delayed interview with respondent did not change Dr. Henry's opinions.

Respondent presented no witnesses at the adjudication trial.

The trial court concluded by a preponderance of the evidence that respondent sexually abused the children. In reaching this conclusion, the trial court noted the custody dispute between mother and respondent, recognizing that this was a consideration when assessing the trustworthiness of mother's testimony about BC's disclosures. But regardless of mother's testimony, the trial court found that allegations of sexual abuse had been established by the testimony from professional witnesses and experts, who detailed BC's disclosures about respondent's sexual abuse.

*Dispositional Hearing*. The case then proceeded to the dispositional phase, during which the Department again presented testimony from Dr. Henry, Wrobel, Orr, and mother, all of whom opined that termination of respondent's parental rights was in the children's best interests. Another CPS employee, Tracy Osterman-Pierce, also testified that termination was in the children's best interests. The trial court took judicial notice of the court file, including the testimony offered at the adjudication trial. The trial court admitted the videos of BC's forensic interviews.

Respondent testified during the dispositional hearing, again denying the allegations of abuse, detailing the contentious nature of his divorce from mother, and describing past actions by mother to frustrate his access to the children. According to respondent, mother had started to make allegations of abuse in January 2019. She took BC to several medical providers prior to October 2019 with suspicions of sexual abuse, though these suspicions were not substantiated by those providers.

In support of his version of events, respondent called several lay witnesses to describe mother's behavior during their separation and divorce and to disavow seeing respondent engage in any inappropriate behavior with children. These witnesses included two of mother's own sisters, respondent's sister, respondent's mother, respondent and mother's former pastor, BC's former play therapist, respondent's therapist, and a family friend who had known both mother and respondent since they were teenagers. Several of the witnesses, including one of mother's sisters, described mother's podcasts and videos as containing "graphic sexual content" and that the boys were in the same room when mother made some of the content. Respondent also called Trooper

Nichols, who again testified that nothing to support BC's reports was found on respondent's electronic devices.

Respondent's final witness was Dr. Richard L. Rickman, a forensic psychologist, whom respondent retained to conduct a psychological evaluation of respondent. According to Dr. Rickman, respondent met and exceeded the "minimum standard of parenting capacity." Dr. Rickman qualified this opinion, however, by noting that, if the allegations of abuse were found to be true, the existence of sexual abuse would present "a huge red flag."

Following the hearing, the trial court found that clear and convincing evidence supported statutory grounds for termination of respondent's parental rights and that termination was in the children's best interests. The trial court found that BC's statements to mother, Orr, Mathis, and Friberg were "trustworthy, credible, and form the foundation for the Court's findings regarding statutory basis pursuant to MCL 712A.19b(3)(b)(*i*)." The trial court further explained, "The credible testimony of behavioral health professionals Renee Orr and Dr. James Henry specifically refute the idea that the statements are coached." The trial court entered an order terminating respondent's parental rights.

*Ginther Hearing*. Respondent appealed to this Court as of right. Respondent also moved this Court to remand for a hearing under *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), and a different panel of this Court granted his motion and remanded for an evidentiary hearing. Briefly stated, respondent maintained that his trial counsel provided ineffective assistance by failing to retain an expert to challenge the reliability and indicia of trustworthiness surrounding BC's disclosures of abuse.

To support his ineffective-assistance claim during the *Ginther* hearing, respondent presented the expert report and testimony of a clinical psychologist, Daniel Swerdlow-Freed, Ph.D. The psychologist provided a detailed overview of child memory and suggestibility, including the vulnerability of children—particularly those three to six years old—to source-monitoring errors. The trial court accepted Dr. Swerdlow-Freed as an expert in the areas of (1) children's memory and suggestibility, and (2) forensic interviewing of children.

Dr. Swerdlow-Freed described in detail the concept of "source monitoring," which relates to the epistemological problem of how people know the information that they know. For children three to six years old, they are still learning to monitor their sources of information. Until children master this idea of source monitoring, they are vulnerable to recalling inaccurately how they obtained information. For example, they may believe that they experienced something that they only overheard being discussed by adults or saw in a video. Dr. Swerdlow-Freed described this as a "developmental vulnerability" arising from the child's "incomplete state of cognitive development." Notably, according to Dr. Swerdlow-Freed, when a child makes a source-monitoring error and accepts a false memory, that memory can seem "the same" to a child as an actual memory of a real experience. False memories can even include emotional expressions.

In view of this vulnerability to source-monitoring errors, Dr. Swerdlow-Freed also explained the importance of using developmentally appropriate questioning with children, such as those embodied in the forensic-interview protocols. He also explained the risks of questioning by individuals, such as parents, who are not trained in forensic-interview protocols, and the potential

for a parent to introduce—intentionally or even unintentionally—false or misleading information that the child will accept as a memory and incorporate into subsequent interviews. Positive reinforcement—such as praising a child for disclosures—can reinforce and encourage repetition of false memories.

In addition to providing general information, Dr. Swerdlow-Freed reviewed materials related to this case, including the forensic interviews, the CPS investigation reports, transcripts of the tender-years hearing, and the CTAC report. Statistically, he testified that, in 85% of the cases he has reviewed, he has found no substantial mistakes relevant to a young child's disclosure of abuse; it was only the remaining 15% of cases, including the current one, in which he found substantial problems.

Dr. Swerdlow-Freed identified several areas of concern in the forensic interviews and the circumstances surrounding BC's disclosures. Overall, he opined that there was a good basis to question the reliability of BC's disclosures because of the various features of the interviews. According to Dr. Swerdlow-Freed, if retained as an expert, he could have educated respondent's trial counsel on topics related to children's memory, suggestibility, child development, and forensic interviewing. He could have more specifically identified problem areas in the forensic interviews and the circumstances surrounding BC's disclosures to aid in cross-examination.

As one of the red flags noted by Dr. Swerdlow-Freed, Orr reported to CPS as follows: "[Orr] reported that after seeing [BC] Tuesday, [mother] reached out on Wednesday and scheduled another appointment to bring [BC] back in stating that he was ready to disclose." Later, in 2020, CPS spoke with Orr, and:

> [Orr] stated that she does worry sometimes that [mother] pushes the kids really hard, but [Orr] stated that she also understands that [mother] comes from a place of being a mom and wanting to protect her kids. [Mother] does push [BC] to tell [Orr] the things that he tells her, and often wants him to disclose things before he is ready, but at this time she believes that the disclosures are all valid.

Dr. Swerdlow-Freed answered that he would have been willing to testify in this case as an expert in these areas.

With respect to his preparation for the *Ginther* hearing, Dr. Swerdlow-Freed testified that he did not review any transcripts from the adjudication trial or dispositional hearing. He explained that he wanted to review only the materials to which trial counsel would have had access when she formulated her litigation strategy.

Respondent's trial counsel also testified at the hearing. Trial counsel's basic theory of the case was that BC's disclosures had been influenced by mother, who was upset about respondent's affairs and the break-up of their family. In preparing the case, counsel reviewed the CPS and police materials, spoke with respondent, and interviewed respondent's witnesses.

Having reviewed the forensic interviews herself, she did not see any "glaring" problems, but she also acknowledged that she is not an expert in this area. Indeed, counsel testified that she did not have any specialized training in forensic interviews, and she had "no idea" of the science

or research on which the forensic protocols are based. When preparing respondent's case, she did not investigate or consider consulting an expert in forensic interviewing or child memory and suggestibility. According to counsel, she was unaware of such experts being used in abuse-and-neglect cases.

To support trial counsel's theory of the case, she intended to rely on Dr. Henry's testimony and have respondent undergo a psychological evaluation with Dr. Rickman with the hopes that this evaluation would show that respondent was "not predisposed to being an offender." Trial counsel explained that she discussed with respondent the tactic of relying on Dr. Henry after the first day of the tender-years hearing. She further explained that she believed respondent did not abuse his children, she had never seen Dr. Henry "get it wrong," and she trusted that Dr. Henry would "get to the bottom of whether there was coaching or influence happening, or if the abuse even happened." Because CTAC could not be retained privately, trial counsel requested and stipulated to the trial court making a referral to Dr. Henry at the end of the second day of the tender-years hearing.

Thereafter, Dr. Henry produced a report that trial counsel described as "a wholly one-sided and slanted referral which produced no substantive evidence of trauma yet suggests termination of parental rights based heavily on statements made by the Agency and [mother]." During the *Ginther* hearing, trial counsel admitted that she stipulated to the admission of the report, believing that any objection to its admission would be futile. Furthermore, she did not object to any statement that might have vouched for BC's credibility; and although she acknowledged that she could have asked the trial court for additional time (but noting that the Department likely would have objected), and she could have tried to find another expert to refute Dr. Henry, she made no attempt to do so.

Respondent also testified at the hearing, confirming that his trial counsel did not suggest engaging an expert and noting that he would have paid for such an expert had she suggested one.

Finally, respondent presented testimony from an attorney, Lisa Kirsch-Satawa, who specializes in child-abuse and child-sexual-assault cases, including both criminal and termination cases. In her practice, Kirsch-Satawa routinely consults and employs experts in areas related to forensic interviewing. To prepare for the *Ginther* hearing, Kirsch-Satawa reviewed the forensic interviews, the CPS report, and the Department's petition; she did not review the transcripts of the adjudication trial or dispositional hearing, nor did she review Dr. Swerdlow-Freed's report because she wanted "to identify the issues as an attorney that I would be consulting with the expert for, not the issues that the expert already determined in this case."

Based on her review of the interviews, she noted several red-flags that would have prompted her to consult an expert. For example, she identified a lack of hypothesis testing (e.g., no questions designed to consider whether there was a non-abuse explanation for BC's statements); the specific disclosures did not correspond to pre-interview allegations; and repetitive questions to which BC answered that he did not know—she actually counted, and BC answered with "I don't know" a total of 109 times. She concluded that, in her opinion, it was unreasonable not to consult with an expert in this case, particularly given BC's age, his inconsistent statements, the occurrence of multiple interviews, and BC's participation in therapy.

Following the hearing, the trial court concluded that respondent had not been denied the effective assistance of counsel. The trial court discounted the testimonies of Dr. Swerdlow-Freed and Kirsch-Satawa because neither of them had reviewed the testimonies of witnesses from the adjudication trial or dispositional hearing. For instance, the trial court noted that Dr. Swerdlow-Freed had not reviewed respondent's trial counsel's cross examination of various witnesses, and this "significantly impacted the value of his testimony for purposes of this hearing" and "some of his unsupported conjecture hurt his credibility." As the trial court summarized,

> The Court is reluctant to give Dr. Swerdlow-Freed's testimony as much weight as respondent-appellant may hope in regard to the issue before the court as it contains a lot of conjecture without foundational knowledge about what witnesses actually said and did at trial and without any knowledge of the lengths that trial counsel went to in preparation for trial.

Similarly with respect to Kirsch-Satawa, the trial court questioned her value as a witness because "her entire focus was on the three forensic interviews," rather than a broader view that would have included the adjudication trial and dispositional hearing.

The trial court concluded that trial counsel's performance did not fall below an objective standard of reasonableness. The trial court observed that trial counsel's "ongoing trial strategy was to have the case evaluated by the Child Trauma Assessment Center under the supervision of Dr. Henry." The trial court rhetorically asked, "[h]ow can a court find the work of the trial attorney ineffective when, through her work, the reliability of the child's statements was reduced to the point that respondent's preferred expert, Dr. Henry, became involved in the evaluation of the case?" With respect to prejudice, the trial court placed considerable weight on the testimonies of Orr and Dr. Henry: "Ms. Orr and Dr. Henry provided significant information that would support the end result in this case even if the statements made by the child at the forensic interviews were excluded. . . . There was sufficient evidence independent of the forensic interviews to support the end result." The trial court concluded that respondent had "not established the claim of ineffective assistance of counsel raised in his motion to remand."

This matter is now ready for appellate review.

## II. ANALYSIS

Respondent claims on appeal that he was denied the effective assistance of counsel, notwithstanding the trial court's decision to the contrary. Respondent also takes issue with the trial court's holdings with respect to statutory grounds for termination of parental rights and the best interests of the children. As explained below, we conclude that respondent was denied his constitutional right to the effective assistance of counsel; given this, we do not reach the latter two claims.

### A. STANDARD OF REVIEW

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review a trial court's

factual findings for clear error, and questions of constitutional law are reviewed de novo. *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). "Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Id.* Whether a respondent can show prejudice is reviewed de novo. *People v Dendel*, 481 Mich 114, 132 n 17; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008). "[T]he test for prejudice is an objective test," and "appellate courts should not simply defer to the trial court's judgment regarding prejudice, even if the trial court was the fact-finder at the original trial, as in this case." *Id.*

## B. CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL

Both the Michigan and federal Constitutions guarantee the right to the assistance of counsel in criminal cases. Const 1963, art 1, § 20; US Const, Am VI. Given the nature of accusations and consequences in child-protective proceedings, this right has been extended to these civil proceedings. *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016).

Respondent argues that his trial counsel provided ineffective assistance of counsel by failing to investigate, consult, and call an expert in forensic interviewing and child memory and suggestibility. Respondent maintains that testimony by an expert such as Dr. Swerdlow-Freed would have provided an effective challenge to the trustworthiness of BC's statements at the tender-years hearing, meaning the statements would not have been admitted into evidence in the first instance. Even if those statements were not excluded, testimony from Dr. Swerdlow-Freed should have been used at the adjudication trial and dispositional hearing to challenge BC's statements, creating a reasonable probability of a different outcome.

"To be constitutionally effective, counsel's performance must meet an objective standard of reasonableness. . . . To obtain relief for the denial of the effective assistance of counsel, the [respondent] must show that counsel's performance fell short of this objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the [respondent's] trial would have been different." *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015) (cleaned up). The effective assistance of counsel is presumed, and a party claiming ineffective assistance bears a heavy burden of proving otherwise. *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004).

### 1. OBJECTIVE STANDARD OF REASONABLENESS

When reviewing a claim of ineffective assistance of counsel, this Court must be cognizant of, and guard against, the bias of applying 20/20 hindsight to counsel's performance. The Court cannot substitute its judgment for that of counsel's on matters of litigation strategy, and counsel's performance must be judged based on the knowledge, expertise, and information reasonably available when counsel formulated and implemented the litigation strategy. *People v Unger*, 278 Mich App 210, 243; 749 NW2d 272 (2008). In reviewing counsel's performance, this Court must "determine whether the strategic choices were made after less than complete investigation, and any choice is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. Counsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012) (cleaned up).

Respondent's claim centers on trial counsel's failure to consult or call an expert witness. In some cases, "the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton v Alabama*, 571 US 263, 273; 134 S Ct 1081; 188 L Ed 2d 1 (2014) (cleaned up). Counsel's selection of an expert is considered an example of litigation strategy; however, this is true only when a decision regarding an expert is made "*after* thorough investigation of the law and facts in a case." *Ackley*, 497 Mich at 390 (cleaned up). Counsel "may be deemed ineffective, in part, for failing to consult an expert when counsel had neither the education nor the experience necessary to evaluate the evidence and make for [herself] a *reasonable*, *informed determination* as to whether an expert should be consulted or called to the stand." *Trakhtenberg*, 493 Mich at 54 n 9 (cleaned up).

Specifically with respect to child-sexual-abuse cases, the potential significance of expert testimony is well-recognized. See *People v Peterson*, 450 Mich 349, 373-374; 537 NW2d 857 (1995), amended 450 Mich 1212 (1995). "Given the nature of the offense and the terrible consequences of a miscalculation—the consequences when an individual, on many occasions a family member, is falsely accused of one of society's most heinous offenses, or, conversely, when one who commits such a crime would go unpunished and a possible reoccurrence of the act would go unprevented—appropriate safeguards are necessary." *Id.* at 374. Indeed, "reliability problems created by children's suggestibility" give rise to "special considerations" related to the role of experts. *Id.* at 371; see also *People v Musser*, 494 Mich 337, 357; 835 NW2d 319 (2013).

In this case, respondent argues that his trial counsel should have obtained an expert in forensic interviewing, child memory, and suggestibility. The expert could have assisted counsel in identifying problems with BC's disclosures during interviews. The expert could have also provided testimony with respect to child memory and suggestibility, including young children's susceptibility to source misattribution, as relevant to addressing the reliability and trustworthiness of BC's disclosures. According to counsel's own testimony, she did not consider or investigate the possibility of such an expert—indeed, she was unaware of such experts being used in child-sexual-abuse cases.

We conclude, based on several considerations, that the performance of trial counsel fell short of the controlling objective standard of reasonableness. First, the trial court erred in a key respect when it determined after the *Ginther* hearing that the views of Dr. Swerdlow-Freed and Kirsch-Satawa lacked sufficient credibility or weight. The trial court explained on remand that it discounted their testimony because they did not review transcripts of the adjudication trial or dispositional hearing or talk with trial counsel to determine what steps she took to prepare for the proceedings. Based on this purported failure to prepare, the trial court concluded that neither witness was particularly helpful.

Ordinarily, an appellate court must defer to a trial court's findings on credibility, with respect to both lay and expert witnesses. MCR 2.613(C); see also *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016) ("We must defer to the special ability of the trial court to judge the credibility of witnesses."). In this instance, however, the trial court made a clear legal error when assessing the credibility of these two witnesses.

As previously noted, it is critical that, when reviewing an attorney's performance through the lens of our ineffective-assistance-of-counsel standard, a court must not apply 20/20 hindsight.

-10-

In preparing for the *Ginther* hearing, respondent sought to guard against this hindsight bias. Both Dr. Swerdlow-Freed and Kirsch-Satawa reviewed only the materials that would have been available to them had they been engaged just prior to the adjudication trial. They did not read transcripts of the subsequent trial and dispositional hearing precisely because those transcripts would not have existed when the original litigation strategy was being developed by counsel. By not reading those latter transcripts, the two witnesses ensured that their views about what strategy counsel should have selected and how counsel should have prepared were based on information that counsel had available to her at the time she formulated her strategy, i.e., prior to the adjudication trial. This should have enhanced their credibility during the *Ginther* hearing, not detracted from it, ceteris paribus.

Second, although not within the scope of the *Ginther* hearing (and therefore not before the trial court on remand), the record shows that Dr. Henry impermissibly vouched for the credibility of BC. This case involves allegations of sexual abuse made by a young child, and these reports are the only evidence of wrongdoing. There were no physical signs of abuse, there were no electronic pictures or videos of abuse, and there were no eye-witnesses of abuse. The entirety of the case rests on the credibility and reliability of BC's disclosures.

One concern in a case like this can arise when an expert vouches for the credibility of a complainant. Credibility is a matter for the fact-finder, not an expert witness. *People v Thorpe*, 504 Mich 230, 260; 934 NW2d 693 (2019) ("Because the trial turned on the jury's assessment of [the victim's] credibility, the improperly admitted testimony wherein [the expert] vouched for [the victim's] credibility likely affected the jury's ultimate decision."). Indeed, under MRE 702, an expert cannot vouch for the credibility of the complainant or another witness. *In re Brimer*, 191 Mich App 401, 407; 478 NW2d 689 (1991). The rules of evidence apply to adjudication trials in child-protective proceedings, MCR 3.972(C)(1), and Dr. Henry testified during the adjudication trial and his report was admitted into evidence.

Whether Dr. Henry's expert views about outside coaching crossed the line into impermissible vouching is a question we need not answer today. See, e.g., *People v Douglas*, 496 Mich 557, 583; 852 NW2d 587 (2014) (concluding that testimony that there was no indication of coaching amounted to improper vouching). We need not answer this question because Dr. Henry went beyond outside coaching in his report. For example, he described his role in this case to include verifying whether BC's disclosures "are credible." He then did, in fact, conclude that the circumstances surrounding BC's statements "all support the veracity of [BC's] statements." These opinions went beyond the penultimate question of outside coaching and went to the ultimate question of BC's credibility. Although trial counsel may have had reason to believe it would have been futile to object to the admission of the report in the abstract, trial counsel stipulated to the admission of the report in its entirety and offered no specific objection with respect to Dr. Henry's opining on the credibility of BC.

And third, even had Dr. Henry not vouched for BC's credibility, there is other evidence in the record to question whether BC could have been influenced by outside sources, whether intentionally or inadvertently. By all accounts and as already recounted, the divorce was quite contentious. Notably, there is evidence in the record that mother's conduct and statements after her separation from respondent—and well before BC's disclosures—raised concerns regarding her desire not to share custody with respondent and her anger with respondent, both of which would

provide a motive for mother to influence BC, and her behavior suggested a willingness to disparage respondent to ensure the custody outcome she desired.

For instance, by her own admission, prior to separation, mother did not suspect that respondent was abusing the children. But shortly after the separation, mother took BC to medical providers with the suspicion of sexual abuse, though abuse was not substantiated by the physical exams. Multiple family members, including her own sisters, testified that mother made disparaging comments about respondent involving the boys, again before any disclosures had been made by BC. And it is undisputed that she abruptly moved with the boys more than two hours away from respondent, without discussing the matter with, or even informing respondent.

Mother was the first person who reported that BC made a disclosure of abuse. Following this initial conversation, mother had additional conversations with BC before he was forensically interviewed. As described in Orr's statements to CPS, mother encouraged—even "pushed"—BC to make disclosures to Orr. Dr. Swerdlow-Freed explained that mother's actions raised a red flag that should have been more thoroughly evaluated by an expert. Although the trial court questioned the basis for Dr. Swerdlow-Freed's concerns regarding mother pushing BC to disclose, the record confirms that Dr. Swerdlow-Freed relied on Orr's statements to CPS. "It is well-settled that an expert witness may rely on hearsay evidence when the witness formulates an opinion." *People v Lonsby*, 268 Mich App 375, 382-383; 707 NW2d 610 (2005).

Trial counsel was certainly aware of the context for BC's disclosures. Indeed, trial counsel testified at the *Ginther* hearing that her strategy was to attempt to show that BC's disclosures were not credible and were instead the product of coaching by mother. Yet, despite having formed this strategy, counsel did not investigate—or even consider investigating—an expert who could have provided valuable information on child memory, suggestibility, source misattribution, and forensic-interview protocols, all of which would have been materially useful to supporting the defense's theory and assisting a fact-finder's assessment of BC's disclosures. Further, trial counsel lacked the scientific background to assess independently the interviews in this case. *Ackley*, 497 Mich at 391 (considering counsel's lack of personal qualifications and education on a topic when considering whether counsel was ineffective for failing to consult an expert).

Particularly concerning, trial counsel testified that she was not aware of such experts being used in child abuse-and-neglect cases. Effective counsel, particularly an attorney practicing in areas involving child-sexual abuse, should be aware of the availability of experts in topics such as child memory, suggestibility, source misattribution, and forensic-interview protocols. Indeed, the "reliability problems created by children's suggestibility" are well-recognized in this area of law. *Peterson*, 450 Mich at 371. Trial counsel failed to exercise reasonable professional judgment by not investigating the possibility of an expert in the first instance, an omission that cannot be excused as trial strategy. See *Ackley*, 497 Mich at 393; *Trakhtenberg*, 493 Mich at 52-53.

Although she did not consider the possibility of an expert with Dr. Swerdlow-Freed's area of expertise, trial counsel did have a trial strategy involving the use of other experts, namely Dr. Henry and Dr. Rickman, neither of whom claimed expertise in forensic-interviewing protocols and related topics like child memory and suggestibility. Given counsel's admitted unawareness of the possibility of employing experts with Dr. Swerdlow-Freed's area of expertise, trial counsel lacked sufficient information to legitimize her choice of other experts. See *Ackley*, 497 Mich at 390.

Regarding Dr. Henry in particular, we emphasize that a person does not receive ineffective assistance of counsel solely because counsel pursues a risky strategy that ultimately backfires. See *In re Ayres*, 239 Mich App 8, 22; 608 NW2d 132 (1999), superseded in part by statute on other grounds as stated in *People v Dipiazza*, 286 Mich App 137; 778 NW2d 264 (2009). In other words, the bare fact that trial counsel gambled on Dr. Henry, only to lose that gamble, does not *per se* render her assistance ineffective. Nevertheless, a risky strategy must be a sound one. As discussed, trial counsel chose to rely on Dr. Henry completely sight-unseen and without investigating or considering any other options. Furthermore, following the receipt of Dr. Henry's adverse expert opinion, trial counsel should have at least considered the possibility of consulting an expert to provide a different perspective. At the *Ginther* hearing, trial counsel expressed concern that if the Department became aware that she had consulted with another expert who then also provided negative information, the Department could subpoena that expert. See MCR 3.922(A)(1)(f). If the expert, however, was not actually called to testify and gained no firsthand factual knowledge that would warrant calling the expert as a fact witness, counsel's mere consultation with an expert would likely be covered under the work-product doctrine. See *People v Tronti*, 176 Mich App 544, 549-551; 440 NW2d 62 (1989); *Kissel v Nelson Packing Co*, 87 Mich App 1, 3-5; 273 NW2d 102 (1978). Ultimately, trial counsel's reliance on Dr. Henry's opinions—without investigating the possibility of an alternate expert to refute those opinions—was not sound trial strategy.

With regard to Dr. Rickman, he conducted a general psychological evaluation of respondent. He did not see BC or review the forensic interviews. He was not an expert in forensic interviewing or child memory and suggestibility. Frankly, Dr. Rickman had nothing to offer that would bear on the reliability of BC's statements. At the *Ginther* hearing, trial counsel testified that she sought Dr. Rickman's evaluation to show that respondent was "not predisposed to being an offender." Expert testimony, however, is not generally permitted regarding whether an individual has characteristics of a sex offender, and in particular, cannot be used to establish the truth of whether sexual offenses were committed. See *People v Dobek*, 274 Mich App 58, 96-97; 732 NW2d 546 (2007). At most, Dr. Rickman's opinions on respondent's mental health and parenting ability may have had some minimal bearing on the children's best interests. But the choice of such a minimally relevant expert—without investigating the possibility of an expert with Dr. Swerdlow-Freed's qualifications—was not based on sufficient information, and it was not a reasonable strategic decision. *Ackley*, 497 Mich at 393; *Trakhtenberg*, 493 Mich at 52-53.

## 2. PREJUDICE

The question remains whether respondent can establish prejudice from counsel's deficient performance. To establish prejudice, a party claiming ineffective assistance "must show that but for counsel's deficient performance, a different result would have been reasonably probable." *Trakhtenberg*, 493 Mich at 55-56 (cleaned up). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ackley*, 497 Mich at 389 (cleaned up).

Under this standard, a respondent does not have to show that the evidence would have ensured a different result, *id*. at 397, nor must a respondent show that counsel's failure more likely than not altered the outcome, *Harrington v Richter*, 562 US 86, 112; 131 S Ct 770; 178 L Ed 2d 624 (2011). "[W]here there is relatively little evidence to support a guilty verdict to begin with (e.g., the uncorroborated testimony of a single witness), the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt." *Trakhtenberg*, 493

Mich at 56 (quotation marks and citation omitted). Although corroboration is not generally required to support allegations of sexual abuse, the lack of corroboration may nevertheless be considered when addressing the question of prejudice. See *Douglas*, 496 Mich at 580 n 6.

BC's out-of-court statements made to third parties were central to the Department's case. BC did not testify, and there was no physical evidence or corroborating eye-witnesses. Despite claims that respondent filmed acts of sexual abuse, no such evidence was found on his electronic devices. Respondent denied the abuse, and after investigating the matter, the local prosecutor declined to pursue charges against respondent. Given that the case hinged on BC's statements, undermining the credibility and reliability of those statements was critical to any reasonable defense. See *id.* at 586.

To bolster the credibility and reliability of BC's statements, the Department presented the testimony of several experts. In the face of this expert evidence, and despite the centrality of BC's credibility and reliability, trial counsel failed to present or even investigate expert testimony on forensic interviewing, child memory, and suggestibility. The result was a one-sided presentation of experts to support the Department's theory of the case. *Ackley*, 497 Mich at 397 ("Because of counsel's omissions and the resulting absence of suitable expert assistance, the prosecution's expert testimony appeared uncontested and overwhelming."). Indeed, the Department emphasized the one-sided nature of the expert testimony during closing, arguing: "When we look at the professionals who have testified in this case, they have all squarely sided on the side of the child and given compelling testimony that was in this proceeding that supports that . . . these sex acts did in fact occur."

The case need not have been so one-sided. Dr. Swerdlow-Freed's report and his testimony at the *Ginther* hearing make clear that there was expert assistance available to provide the fact-finder with information on child memory and development, the science underlying the forensic protocols, and concepts like source misattribution, all of which would have been relevant to an assessment of BC's credibility and reliability as well as helpful to respondent's defense strategy that mother influenced BC. Indeed, particularly given BC's young age—only four and five years old—when he began making disclosures and undergoing forensic interviews, Dr. Swerdlow-Freed's expertise on child memory and suggestibility establishes a reasonable probability of a different outcome had counsel exercised reasonable professional judgment in investigating and presenting expert testimony to support the defense's theory of the case.

In reaching this conclusion, two final points warrant brief mention. First, the record shows that trial counsel did not sit on her hands, but instead marshalled several witnesses to bolster respondent's case. Trial counsel also engaged in vigorous cross-examination, and, as the trial court found, she did inquire into various reasons to doubt BC's disclosures. Nothing in this opinion should be read to downplay the work that trial counsel did. With that said, our courts have recognized that lay testimony is often unlikely to counter expert testimony in cases like this. *Peterson*, 450 Mich at 374; see also *Ackley*, 497 Mich at 394 ("The defendant's own testimony and that of his lay character witnesses were extremely unlikely to counter this formidable expert testimony. Therefore, the absence of expert assistance in the defendant's favor was critical."). As both the federal Supreme Court and our Supreme Court have recognized, "a single, serious error may support a claim of ineffective assistance of counsel." *Kimmelman v Morrison*, 477 US 365, 383; 106 S Ct 2574; 91 L Ed 2d 305 (1986); *Ackley*, 497 Mich at 393.

-14-

Second, in concluding that respondent was not denied the effective assistance of counsel following the *Ginther* hearing, the trial court viewed Dr. Swerdlow-Freed's testimony as centered solely on the three forensic interviews. The trial court reasoned that, even if the forensic interviews were excluded, BC made statements to Orr and Dr. Henry outside of those interviews, and these statements "provided significant information that would support the end result." But we do not read Dr. Swerdlow-Freed's testimony as so circumscribed. Dr. Swerdlow-Freed (and Kirsch-Satawa) raised several specific, concrete areas of concern that went to the very heart of this case— were BC's disclosures credible and reliable? If one was to assume for the sake of argument that the disclosures were not credible and reliable, then this would necessarily have to cast the trauma assessments of Orr and Dr. Henry in a much different light, at the very least in terms of what was causing the signs of trauma that Orr and Dr. Henry observed.

In the final summation, this case rises or falls with the credibility and reliability of BC's disclosures, and an expert should have been consulted by respondent's trial counsel so that the disclosures could be subjected to the crucible of the adversarial process. See *People v Joly*, 336 Mich App 388, 396; 970 NW2d 426 (2021) ("The truth-seeking function of the judicial process depends on a party subjecting all of the evidence—its own and the opposing party's evidence—to the crucible of critical analysis, cross-examination, and forceful argument."). As our Supreme Court explained in a similar context, "While we cannot say that a battle of the experts would have ensured" a different outcome, "counsel's failure to prepare or show up for the battle sufficiently undermines our confidence in the outcome of this case to entitle the [respondent] to relief." *Ackley*, 497 Mich at 397.

### III. CONCLUSION

As explained, respondent was denied the effective assistance of counsel. We do not reach respondent's other claims on appeal. Accordingly, we vacate the trial court's decision to admit BC's tender-years statements, the order of adjudication, as well as the order terminating respondent's parental rights. We remand the case for new proceedings, including a new tender-years hearing should the Department again seek to introduce BC's out-of-court statements under MCR 3.972(C)(2).

Vacated and remanded for further proceedings. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Amy Ronayne Krause
/s/ Kristina Robinson Garrett

-15-